

## Office of the Attorney General
### State of Texas

DAN MORALES
ATTORNEY GENERAL

September 24, 1992

Clinton M. DeWolfe, O.D.
Chairman
Texas Optometry Board
9101 Burnet Road, Suite 214
Austin, Texas 78758

Opinion No. DM-170

Re: Construction of V.T.C.S. article 4552-5.11 of the Texas Optometry Act, and related questions   (RQ-396)

Dear Dr. DeWolfe:

You have asked us to construe V.T.C.S. article 4552-5.11(a) and (b) of the Texas Optometry Act (the act), V.T.C.S. article 4552-1.01 *et seq.*, chapter 10. As background material, you provide a hypothetical set of facts. You state that the hypothetical facts are similar to an actual circumstance involving a particular optometrist practicing in the State of Texas, but you also state that the facts are not unique to this particular optometrist. The hypothetical situation you set forth is as follows:

> Dr. Smith (hypothetical name) is a licensed optometrist in the State of Texas. Dr. Smith and one other optometrist have formed a partnership (legal entity) for the practice of optometry and also for the sale and dispensing at retail of optometric goods[1] at a given location in Texas. Dr. Smith and his partner are 100% owners of the office in which optometry is practiced and in which optometric goods are dispensed and sold at retail. The partnership practices under a trade name or assumed name.
>
> Dr. Smith has similar partnerships for the practice of optometry and for the sale and dispensing at retail of ophthalmic goods at approximately fifteen (15) additional offices located throughout Texas. Each office practices under

---

[1]You have explained that you used the term "optometric goods" as a synonym for "ophthalmic goods."

the same trade name or assumed name. With respect to each office, Dr. Smith has formed a partnership (legal entity) with one other different optometrist. In other words, Dr. Smith has a partnership interest in approximately fifteen (15) offices in Texas where ophthalmic goods are sold at retail. In addition, Dr. Smith has three locations in Texas where optometry is practiced and ophthalmic goods are sold and dispensed at retail which are 100% owned and operated by Dr. Smith, individually. Dr. Smith also has an ownership interest in a chain of stores where optical goods[2] are dispensed and sold at retail. [Emphasis in original.] [Footnotes added.]

You have informed us that you do not know whether Dr. Smith has actual partnership agreements with all of the other optometrists, or whether he has some other kind of investment arrangement with some of the other optometrists. Thus, you have not used the word "partnership" in its technical, legal sense, but simply to refer to any kind of arrangement whereby Dr. Smith has become a co-owner of a business where optometry is practiced and ophthalmic goods are sold.

You believe that article 4552-5.11 of the act prohibits Dr. Smith from, among other things, controlling or attempting to control the professional judgment, manner of practice, or practice of an optometrist. Article 4552-5.11 states in pertinent part as follows:

(a) Any person who is a manufacturer, wholesaler, or retailer of ophthalmic goods is prohibited from:

(1) directly or indirectly controlling or attempting to control the professional judgment, the manner of practice, or the practice of an optometrist or therapeutic optometrist; or

(2) directly or indirectly employing or hiring or contracting for the services of an optometrist or therapeutic optometrist if any part of such optometrist's or therapeutic optometrist's duties involve the practice of optometry or therapeutic optometry; or

---

[2]You have explained that you used the term "optical goods" as a synonym for "ophthalmic goods."

(3) directly or indirectly making any payment to an optometrist or therapeutic optometrist for any service not actually rendered.

(b) For purposes of this section "controlling or attempting to control the professional judgment, the manner of practice, or the practice of an optometrist or therapeutic optometrist" shall include but not be limited to:

(1) setting or attempting to influence the professional fees of an optometrist or therapeutic optometrist;

(2) setting or attempting to influence the office hours of an optometrist or therapeutic optometrist;

(3) restricting or attempting to restrict an optometrist's or therapeutic optometrist's freedom to see patients on an appointment basis;

(4) terminating or threatening to terminate any lease, agreement, or other relationship in an effort to control the professional judgment, manner of practice, or practice of an optometrist or therapeutic optometrist;

(5) providing, hiring, or sharing employees or business services or similar items to or with an optometrist or therapeutic optometrist; or

(6) making or guaranteeing a loan to an optometrist or therapeutic optometrist in excess of the value of the collateral securing the loan.

(c) It is the intent of the legislature to prevent manufacturers, wholesalers, and retailers of ophthalmic goods from controlling or attempting to control the professional judgment, manner of practice, or the practice of an optometrist or therapeutic optometrist, and the provisions of this section shall be liberally construed to carry out this intent.

. . . .

(g) This section shall not apply where the manufacturer, wholesaler, or retailer of ophthalmic goods is a licensed optometrist, therapeutic optometrist, or physician or legal entity 100 percent owned and controlled by one or more licensed optometrists, therapeutic optometrists, or physicians; however, the exception set forth in this subsection shall not apply where the optometrist, therapeutic optometrist, or legal entity has offices at more than three locations.

The legislature amended article 4552-5.11 in 1981 to read substantially as it does now.[3] *See* Acts 1981, 67th Leg., ch. 758, § 2, at 2807-08. The legislature designed the 1981 amendment to prohibit "any person who is a manufacturer, wholesaler, or retailer of ophthalmic goods from controlling an optometrist, from hiring an optometrist to perform optometry and from paying for services not rendered." House Comm. on Gov't Organization, Bill Analysis, S.B. 109, 67th Leg. (1981). Apparently, the legislature amended article 4552-5.11 in response to a common situation in which a manufacturer, a wholesaler, or a retailer of ophthalmic goods pressured an optometrist[4] to recommend to the optometrist's patients that they purchase certain ophthalmic products produced or sold by the manufacturer, wholesaler, or retailer. The Texas Optometry Act: Hearings on S.B. 109 Before the Senate Comm. on Hum. Res., 67th Leg. (Mar. 25, 1981) (statement of Larry Niemann, representative of and attorney for Texas Optometric Association) (copy on file with Senate Staff Services). For example, a manufacturer might offer an optometrist favorable lease terms on equipment or office space. *Id.* However, the contract between the manufacturer and optometrist would contain a provision authorizing the manufacturer to cancel the lease without cause upon thirty days notice. *Id.* In practice, the manufacturer would exercise the cancellation clause if the optometrist failed to charge fees that the manufacturer felt were "reasonable," failed to keep hours the manufacturer "suggested," or if a certain percentage of the

---

[3]Prior to amendment in 1981, article 4552-5.11 restricted optometrists' use of window displays and signs. In 1991 the legislature again amended article 4552-5.11, but at that time the legislature only added the term "therapeutic optometrist" to subsections (a)-(c), (g). Acts 1991, 72d Leg., ch. 588, § 18, at 2113.

[4]Article 4552-5.11 applies to both optometrists and therapeutic optometrists. *See* V.T.C.S. art. 4552-1.02(1), (7) (defining "practice of optometry" and "practice of therapeutic optometry"). Throughout this opinion, we will use the terms "optometrist" or "optometrists" to refer to both classifications of practitioners.

optometrist's patients did not purchase their ophthalmic goods from the manufacturer. *Id.*; *see also* Sworn Statement of Morris M. Morgan, Jr. (Aug. 26, 1980) (referred to in Hearings in S.B. 109 Before the Senate Comm. on Hum. Res., 67th Leg. (Mar. 25, 1981)) (on file with Senate Comm. on Health and Hum. Services); Sworn Statement of James Shamburger (Aug. 12, 1980) (referred to in Hearings on S.B. 109 Before the Senate Comm. on Hum. Res., 67th Leg. (Mar. 25, 1981)) (on file with Senate Comm. on Health and Hum. Services). The legislature's statement of intention, found in article 4552-5.11(c), clearly expresses the legislature's desire that this kind of economic coercion stop, and that an optometrist or therapeutic optometrist be free to recommend to his or her patients the best products for each particular patient. *See supra* (quoting text of art. 4552-5.11(c)); The Texas Optometry Act: Hearings on S.B. 109 Before the Senate Comm. on Hum. Res., 67th Leg. (Mar. 25, 1981) (statement of Larry Niemann, representative of and attorney for Texas Optometric Association) (copy on file with Senate Staff Services); *cf.* V.T.C.S. art. 4552-5.13 (containing professional responsibility require-ments for optometrists); *id.* art. 4552-5.14 (restricting optometrists' authority to lease space from mercantile establishments); *id.* art. 4552-5.15 (requiring optometrists to practice completely and totally separate from dispensing opticians).

You ask how to define "retailer of ophthalmic goods" in the context of article 4552-5.11. The act defines neither "retailer" nor "ophthalmic goods." However, the act defines "ophthalmic dispenser" as "a person not licensed as an optometrist, therapeutic optometrist, or physician who sells or delivers to the consumer fabricated and finished spectacle lenses, frames, contact lenses, or other ophthalmic devices" that an optometrist, therapeutic optometrist, or physician has prescribed. V.T.C.S. art. 4552-1.02(5). We believe that the kinds of goods an ophthalmic dispenser sells or delivers are "ophthalmic goods."

To determine the meaning of "retailer," we turn to the common understanding of the term. *See* Gov't Code § 312.002(a) (providing that, in general, words used in statute shall be given their ordinary meaning). A "retailer" is "a person engaged in making sales to ultimate consumers." BLACK'S LAW DIC-TIONARY 1182 (5th ed. 1987). We do not understand "retailer," as article 4552-5.11 uses the term, to refer only to a human person but also to include legal entities such as corporations or partnerships. *See* V.T.C.S. art. 4552-5.11(g). Thus, a "retailer of ophthalmic goods" is a person or legal entity that sells to ultimate consumers spectacle lenses, frames, contact lenses, and other ophthalmic devices.

Clearly, all of the businesses that Dr. Smith wholly owns or in which he has an ownership interest are "retailers of ophthalmic goods." As to those businesses Dr. Smith does not wholly own, the question becomes whether Dr. Smith is a retailer of ophthalmic goods simply by virtue of his ownership interest in the businesses. We conclude that his ownership interest does make him a "retailer of ophthalmic goods" for purposes of article 4552-5.11. Dr. Smith's ownership interest in a business engaged in selling ophthalmic goods puts him in a position to exercise control over the professional judgment, manner of practice, or practice of the optometrist who is Dr. Smith's co-owner and who practices optometry at the business.

Subsection (c) instructs us liberally to construe the act to prevent the exercise of control over optometrists. Accordingly, for purposes of V.T.C.S. article 4552-5.11, we believe "retailer of ophthalmic goods" must include any person with an ownership interest in a business that sells ophthalmic goods. In general, of course, a retailer of ophthalmic goods is subject to the restrictions that article 4552-5.11(a) and (b) articulate.

We note, however, that article 4552-5.11(g) excepts from these restrictions a retailer of ophthalmic goods who is a licensed optometrist or that is a legal entity wholly owned and controlled by one or more licensed optometrists, so long as the optometrist or legal entity has offices at fewer than four locations. In our opinion, "office" indicates a place where ophthalmic goods are sold.[5] Under the hypothetical

---

[5]The act does not define "offices." Additionally, we have not found any legislative history indicating how the legislature meant to use the term. Consequently, we refer to the common understanding of the word. *See* Gov't Code § 312.002(a) (providing that, in general, words used in statute shall be given their ordinary meaning). Here, we construe the term "offices" after examining case law and other sources. *Accord Colorado State Civil Serv. Employees Ass'n v. Love*, 448 P.2d 624, 630 (Colo. 1968) (defining "office" as "place of business"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 820 (1990) (defining "office" as "place where a particular kind of business is transacted . . . as . . . the place in which a professional person conducts his or her professional business"); *see Bigham v. State*, 20 S.W. 577, 577 (Tex. Crim. App. 1892), *overruled on other grounds*, *Williamson v. State*, 44 S.W. 1107 (Tex. Crim App. 1898) (defining "office" as "place where a particular kind of business . . . is transacted"); *cf. Orlikowski v. Strash*, 228 N.Y.S.2d 497, 498 (N.Y. App. Div. 1962) (defining "office" as "a room or any part of a building in which a person carries on his usual occupation"); *Red Acres Improvement Club, Inc. v. Burkhalter*, 241 S.W.2d 921, 925 (Tenn. 1951) (defining "office" as "room or building in which a person transacts his business or carries on his stated occupation").

you have set up, Dr. Smith wholly owns offices at three locations in Texas at which ophthalmic goods are sold. Additionally, he has an ownership interest in offices at approximately fifteen other locations at which ophthalmic goods are sold. In our opinion, Dr. Smith has "offices at more than three locations" and thus is subject to the restrictions section article 4552-5.11(a) and (b) articulates.[6]

Your second question asks whether, if Dr. Smith is a "retailer of ophthalmic goods" for purposes of article art. 4552-5.11(a) and (b), he may maintain an exception under article 4552-5.11(g) with respect to the three offices he wholly owns. You contend that he may not. We agree. Once an optometrist has more than three offices at which ophthalmic goods are sold, all offices are subject to the restrictions set out in subsections (a) and (b).

## S U M M A R Y

Any person with an ownership interest in a business selling ophthalmic goods is a "retailer of ophthalmic goods" for purposes of V.T.C.S. article 4552-5.11 of the Texas Optometry Act. An optometrist who is also a retailer of ophthalmic goods and who has offices at fewer than four locations is excepted from

---

[6]We note that article 4552-5.15(c) authorizes an optometrist to "engage in the business of a dispensing optician, own stock in a corporation engaged in the business of a dispensing optician, or be a partner in a firm engaged in the business of a dispensing optician," so long as certain conditions are met. The act defines "dispensing optician" as synonymous with "ophthalmic dispenser." V.T.C.S. art. 4552-1.02(5); see supra p.6 (quoting definition of "ophthalmic dispenser"). In other words, both a dispensing optician and an ophthalmic dispenser sell or deliver to a consumer spectacle lenses, frames, and contact lenses. V.T.C.S. art. 4552-1.02(5). While article 4552-5.15 places no limit on the number of businesses dispensing optical goods in which an optometrist may hold an ownership interest, article 4552-5.11 restricts an optometrist who has ownership interests in more than three offices at which ophthalmic goods are sold. We believe that an optometrist who has ownership interests in more than three businesses at which optical goods are sold is subject to the restrictions articulated in article 4552-5.11.

the restrictions listed in article 4552-5.11. Such an optometrist who has offices at four or more locations is subject to the restrictions established in article 4552-5.11(a) and (b) as to all of his or her offices.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Kymberly K. Oltrogge
Assistant Attorney General